UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| Kavon Jenkins, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | 17-CV-7764 (VEC) |
| | : | |
| Yellowstone Properties, Inc.; Orlando Franco, | : | |
| *individually and in his official capacity*; | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Daniel W. Morris
Jamie Lang
Clifton Budd & DeMaria, LLP
*Attorneys for Defendants*
350 Fifth Avenue, 61st Floor
New York, NY 10118
Tel: (212) 687-7410
Fax: (212) 687-3275

**TABLE OF CONTENTS**

Table of Authorities.................................................................................................... i

Preliminary Statement............................................................................................... 1

Factual Background ................................................................................................... 2

Argument ................................................................................................................... 9

   1.  Summary Judgment Standard ...................................................................... 9

   2.  Jenkins cannot make out a claim for discrimination under the State or City
      Human Rights Law because Yellowstone applied the same standards to him
      that it applied to his coworkers ................................................................... 9

         A.  New York State Human Rights Law ................................................ 10

         B.  New York City Human Rights Law ................................................. 12

   3.  Jenkins cannot make out a claim for a Hostile Work Environment under either
      the State or City Human Rights Law because the alleged comments were not
      sufficiently severe ...................................................................................... 13

         A.  New York State Human Rights Law ................................................ 13

         B.  New York City Human Rights Law ................................................. 16

   4.  Jenkins' Whistleblower claim fails because he is unable to identify an actual
      violation of the law that presented a general threat to the public safety ......................... 18

   5.  Jenkins' Intentional Infliction of Emotional Distress cause of action fails
      because he cannot meet the high evidentiary threshold imposed by New York
      Courts......................................................................................................... 20

   6.  Jenkins' spread-of-hours cause of action must be dismissed because New York
      Labor Law's spread-of-hours requirement does not apply to Building Service
      Workers....................................................................................................... 24

   7.  There is no independent cause of action for a recordkeeping violation under the
      FLSA, so Jenkins' Fourth Cause of Action should be dismissed ...................... 25

Conclusion ............................................................................................................... 25

# Table of Authorities

Cases

*Abrams v. Dep't of Pub. Safety*,
   764 F.3d 244 (2d Cir. 2014) ................................................................................ 9

*Adam v. Glen Cove Sch.*,
   No. 06-CV-1200 JFB MLO, 2008 WL 508689 (E.D.N.Y. Feb. 21, 2008) ............................. 15

*Albuja v. Nat'l Broad. Co. Universal*,
   851 F. Supp. 2d 599 (S.D.N.Y. 2012) ................................................................. 10

*Almonte v. 437 Morris Park, LLC*,
   No. 14 CIV. 5951 (KPF), 2015 WL 7460019 (S.D.N.Y. Nov. 24, 2015)................................ 24

*Bender v. City of New York*,
   78 F.3d 787 (2d Cir. 1996) ............................................................................... 20

*Buchwald v. Silverman Shin & Byrne PLLC*,
   149 A.D.3d 560 (N.Y. App. Div. 2017)................................................................... 16

*Campbell v. Cellco P'ship*,
   860 F. Supp. 2d 284 (S.D.N.Y. 2012) .................................................................... 10

*Chanko v. Am. Broad. Companies Inc.*,
   27 N.Y.3d 46 (2016)........................................................................................ 21

*Chiara v. Town of New Castle*,
   126 A.D.3d 111 (N.Y. App. Div. 2015) ............................................................... 13, 14

*Chin v. New York City Hous. Auth.*,
   106 A.D.3d 443 (N.Y. App. Div. 2013).................................................................... 11

*Cunningham v. Elec. Data Sys. Corp.*,
   579 F. Supp. 2d 538 (S.D.N.Y. 2008) .................................................................... 24

*Davis-Bell v. Columbia Univ.*,
   851 F. Supp. 2d 650 (S.D.N.Y. 2012) .................................................................... 14

*Dougherty v. Mem'l Sloan-Kettering Cancer Ctr.*,
   No. 00 CIV.4083 JGK, 2002 WL 1610916 (S.D.N.Y. July 22, 2002) ................................ 18

*Elwell v. Univ. Hosps. Home Care Servs.*,
   276 F.3d 832 (6th Cir. 2002)............................................................................. 24

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998)........................................................................................ 14

*Forrest v. Jewish Guild for the Blind*,
   3 N.Y.3d 295 (2004)........................................................................................ 13

*Frank v. Walgreens Co.*,
   No. 09 CV 955 DRH WDW, 2011 WL 4465210 (E.D.N.Y. Sept. 26, 2011)..................... 18, 19

*Freedom Calls Found. v. Bukstel*,
   No. 05 CV 5460 SJ VVP, 2006 WL 2792762 (E.D.N.Y. Sept. 7, 2006) ........................... 21, 22

*Fullard v. City of New York,*
  274 F. Supp. 2d 347 (S.D.N.Y. 2003) ......................................................... 10

*Furfero v. St. John's Univ.,*
  94 A.D.3d 695 (N.Y. App. Div. 2012) .......................................................... 11

*Galabya v. New York City Bd. of Educ.,*
  202 F.3d 636 (2d Cir. 2000) ......................................................................... 10

*Geldzahler v. New York Med. Coll.,*
  746 F. Supp. 2d 618 (S.D.N.Y. 2010) ......................................................... 20

*Harris v. Forklift Sys., Inc.,*
  510 U.S. 17 (1993) ....................................................................................... 14

*Hazen Paper Co. v. Biggins,*
  507 U.S. 604 (1993) ....................................................................................... 9

*Henry v. NYC Health & Hosp. Corp.,*
  18 F. Supp. 3d 396 (S.D.N.Y. 2014) ........................................................... 10

*Hill v. Rayboy-Brauestein,*
  467 F. Supp. 2d 336 (S.D.N.Y. 2006) ......................................................... 10

*Howell v. New York Post Co.,*
  81 N.Y.2d 115 (1993) ................................................................................... 20

*Katz v. Beth Israel Med. Ctr.,*
  No. 95 CIV. 7183 AGS, 2001 WL 11064 (S.D.N.Y. Jan. 4, 2001) ............. 10

*Kaur v. New York City Health & Hosps. Corp.,*
  688 F. Supp. 2d 317 (S.D.N.Y. 2010) ..........................................11, 12, 16, 17

*Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP,*
  120 A.D.3d 18 (N.Y. App. Div. 2014) .......................................................... 17

*Kolenovic v. ABM Indus. Inc.,*
  361 F. App'x 246 (2d Cir. 2010) ................................................................... 16

*La Marca-Pagano v. Dr. Steven Phillips, P.C.,*
  129 A.D.3d 918 (N.Y. App. Div. 2015) ........................................................ 13

*Liburd v. Bronx Lebanon Hosp. Ctr.,*
  No. 07 CIV. 11316 (HB), 2009 WL 900739 (S.D.N.Y. Apr. 3, 2009) ......... 14

*Lindsay v. Ass'n of Prof'l Flight Attendants,*
  581 F.3d 47 (2d Cir. 2009) ............................................................................. 8

*Lumhoo v. Home Depot USA, Inc.,*
  229 F. Supp. 2d 121 (E.D.N.Y. 2002) .......................................................... 15

*Lytle v. JPMorgan Chase,*
  No. 08 CIV. 9503 DAB JLC, 2012 WL 393008 (S.D.N.Y. Feb. 8, 2012) ............... 15

*Mariano v. Town of Orchard Park,*
  No. 09-CV-916S, 2011 WL 5979261 (W.D.N.Y. Nov. 27, 2011) .............. 24

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) ....................................................................................... 9

*McNally v. Swift Transp. Co.,*
  35 A.D.3d 1238 (N.Y. App. Div. 2006) ........................................................ 19

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985) ........................................................................................ 8

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
  715 F.3d 102 (2d Cir. 2013) ....................................................................................... 11

*Murphy v. Am. Home Prod. Corp.*,
  58 N.Y.2d 293 (1983)................................................................................................ 20

*Murray v. Visiting Nurse Servs. of N.Y.*,
  528 F. Supp. 2d 257 (S.D.N.Y. 2007) ...................................................................... 15

*Noble v. 93 Univ. Place Corp.*,
  303 F. Supp. 2d 365 (S.D.N.Y. 2003) ...................................................................... 18

*O'Sullivan v. New York Times*,
  37 F. Supp. 2d 307 (S.D.N.Y. 1999) .......................................................................... 8

*Pagan v. New York State Div. of Parole*,
  No. 98 CIV.5840 FM, 2003 WL 22723013 (S.D.N.Y. Nov. 18, 2003)................ 14, 15

*Panzarino v. Deloitte & Touche LLP*,
  No. 05 CIV.8502 BSJ RLE, 2009 WL 3539685 (S.D.N.Y. Oct. 29, 2009) ............. 17

*Perez v. Consol. Edison Corp. of New York*,
  No. 02CIV.2832(PKC)(FM), 2006 WL 2707316 (S.D.N.Y. Sept. 20, 2006) ......... 18

*R.G. Grp., Inc. v. Horn & Hardart Co.*,
  751 F.2d 69 (2d Cir. 1984) .......................................................................................... 8

*Raspardo v. Carlone*,
  770 F.3d 97 (2d Cir. 2014) ........................................................................................ 13

*Reeves v. Sanderson Plumbing Prod., Inc.*,
  530 U.S. 133 (2000)..................................................................................................... 9

*Reyes v. Energy Transp. Corp.*,
  No. 96 CIV. 3321 (JSM), 1997 WL 256923 (S.D.N.Y. May 16, 1997)................... 18

*Richards v. New York City Dep't of Educ.*,
  No. 13-CV-16 VEC, 2015 WL 4164746 (S.D.N.Y. July 10, 2015) ..........9, 11, 13, 16

*Robles v. Cox & Co.*,
  841 F. Supp. 2d 615 (E.D.N.Y. 2012) .................................................................. 21, 22

*Rogers v. Bank of New York Mellon*,
  No. 09 CIV. 8551 (HBP), 2016 WL 4362204 (S.D.N.Y. Aug. 15, 2016) ............... 15

*Ruiz v. Lenox Hill Hosp.*,
  146 A.D.3d 605 (N.Y. App. Div. 2017).................................................................... 20

*Schwapp v. Town of Avon*,
  118 F.3d 106 (2d Cir. 1997) ...................................................................................... 14

*Serrano v. New York State Dep't of Envtl. Conservation*,
  No. 12-CV-1592 (MAD/CFH), 2017 WL 1194238 (N.D.N.Y. Mar. 30, 2017)....... 14

*Smalls v. Allstate Ins. Co.*,
  396 F. Supp. 2d 364 (S.D.N.Y. 2005) ...................................................................... 11

*Stuto v. Fleishman*,
  164 F.3d 820 (2d Cir. 1999) .................................................................................. 21, 22

*Tolbert v. Smith*,
  790 F.3d 427 (2d Cir. 2015) ................................................................... 9, 13
*Tomo v. Episcopal Health Servs., Inc.*,
  85 A.D.3d 766 (N.Y. App. Div. 2011)......................................................... 18
*Tse v. New York Univ.*,
  No. 10 CIV. 7207 DAB, 2013 WL 5288848 (S.D.N.Y. Sept. 19, 2013)................................. 16
*Ulysse v. AAR Aircraft Component Servs.*,
  128 A.D.3d 1053 (N.Y. App. Div. 2015)....................................................... 20
*Vinokur v. Sovereign Bank*,
  701 F. Supp. 2d 276 (E.D.N.Y. 2010) ......................................................... 12
*Webb-Weber v. Cmty. Action for Human Servs., Inc.*,
  23 N.Y.3d 448 (2014)........................................................................ 18
*Williams v. New York City Hous. Auth.*,
  61 A.D.3d 62 (N.Y. App. Div. 2009)........................................................11, 16

Statutes

29 U.S.C.A. § 211(c) (West) .................................................................... 24
29 U.S.C.A. § 215 (West) ....................................................................... 24
N.Y. Lab. Law § 740 (McKinney) .......................................................... 18, 19, 20


Regulations

12 NYCRR § 141 .................................................................................24

12 NYCRR § 142 .................................................................................24

## Preliminary Statement

Plaintiff Kavon Jenkins is a former employee of Defendant Yellowstone Property Management, Inc. For approximately two and a half years, he worked — primarily as a porter — at several of Yellowstone's buildings in the Bronx. This lawsuit is about Jenkins' claims that Yellowstone failed to pay him properly (claims under the FLSA and New York Labor Law), discriminated against him because of his race (claims under the New York State and City Human Rights laws), retaliated against him because he complained about rats in the basement (New York Labor Law § 740), and that Yellowstone intentionally subjected him to severe emotional distress (Intentional  Infliction of Emotional Distress). (Complaint, Morris Dec. Ex. A). Defendants brings this Motion for Partial Summary Judgment seeking dismissal of all of Jenkins' claims, except those related to the payment of his wages.[1]

In July 2017, Jenkins' immediate supervisor asked him to do his job (clean and sweep the building). He refused and walked off the job instead. By this time, Jenkins had become increasingly frustrated with Yellowstone. The frustration was mutual. Yellowstone hired Jenkins in 2014 because it saw great potential in him. Throughout his employment his immediate supervisor as well as Yellowstone's Property Manager (and individual defendant), Orlando Franco, recognized his potential and tried to teach him how to be a successful worker. Jenkins enjoyed a fraternal, if sometimes course, comradery with his coworkers. Yellowstone and his coworkers genuinely care about Jenkins. After discovering Jenkins was homeless, Yellowstone provided Jenkins with an apartment with preferential rent. But after Jenkins fell significantly behind on his rent, Yellowstone was forced to institute a landlord-tenant proceeding against him. That proceeding changed Jenkins path completely. After the proceeding was instituted, Jenkins

---

[1] Defendants move for Summary Judgment on Jenkins' recordkeeping wage claim, which is not related to the payment of wages.

stopped performing duties he was asked to do. Though he had long been fearful of the rats in his building, he began refusing to clean out garbage, a central responsibility for porters. Yellowstone disciplined him for his insubordination.

None of the third through eleventh causes of action have merit. Yellowstone and Franco deny Jenkins' allegations. Jenkins was not discriminated or retaliated against or subjected to a hostile work environment because of his race. He is not subject to the protections under the Whistleblower Act as he did not complain about a practice which endangered the health and safety of the public. Defendants further deny that Jenkins was subjected to intentional infliction of emotional distress. As a result, the Court should dismiss those causes of action.

## Factual Background

Yellowstone is a property management company that manages nine residential apartment buildings in the Bronx, including 751 Walton Ave., 731 Gerard Ave., and 175 East 151st Street ("East 151st Street"). (Franco Dep. p. 14). Arthur Green is Yellowstone's President. (Franco Dep. p. 12). Orlando Franco is employed by Yellowstone as a Property Manager. (Franco Dep. p. 9). Franco reports to Green. (Franco Dep. p. 12). For the majority of Jenkins' employment, he reported to Edgar Roman, the building superintendent for East 151st Street, but Franco and Jenkins interacted regularly. (Roman Dep. pp. 10, 51; Franco Dep. pp. 16-17).

In the fall of 2014, Jenkins replied to an advertisement for work. After submitting his resume, he interviewed with Franco and Green and was hired. (Jenkins Dep. pp. 19, 21-23; Franco Dep. pp. 14-15). He initially worked as a painter. (Jenkins. Dep. p. 23). He would paint in any of the various buildings that Yellowstone manages. (Jenkins Dep. p. 26). After approximately nine months, his duties changed and he began performing some porter duties as well. He also began working regularly at 751 Walton Avenue after that building's porter fell ill. (Jenkins Dep.

pp. 39-40; Franco Dep. pp. 17, 23). His porter duties included, sweeping in front of the building, cleaning the trash area, and mopping the building. (Jenkins Dep. p. 44). Not long thereafter, Green decided to eliminate the painter position. (Franco Dep. p. 29). Green and Franco decided to offer Jenkins a regular porter position at 731 Gerard Avenue. (Franco Dep. p. 30). They decided to assign him to a smaller building to assess his performance as a porter before he was assigned to a larger building. (Franco Dep. p. 30). Jenkins reported to the building's superintendent, Milton Guzman, and his duties remained largely the same as when he performed porter duties at 731 Gerard. (Franco Dep. p. 32; Jenkins. Dep. pp. 44-45). He remained there for approximately six months. (Franco Dep. p. 29).

In January 2016, Yellowstone determined that it would be better to have Jenkins work with Roman at 151st Street. (Franco Dep. pp. 34-35). He consulted with Green and Roman, who both thought that the transfer was a good idea. (Franco Dep. pp. 35-36). Jenkins was transferred to work at 175 E. 151st St. in January 2016. The porter at 151st Street was transferred to 731 Gerard. (Jenkins. Dep. p. 47). At 151st Street, Jenkins reported to Edgar Roman, the building's superintendent. His duties there were the same as his porter duties at the other buildings, the only difference being that 151st street had a trash compactor, where the other buildings only had an area for the building's trash. (Jenkins. Dep. pp. 46-47).

Sometime during his employment, Jenkins began staying in 751 Walton overnight because he was homeless. (Jenkins Dep. p. 49). Franco discovered that Jenkins was homeless and created a living area for Jenkins in the basement, so Jenkins would not be on the street. (Franco Dep. pp. 123-24). He did so without the authority of Green. (Franco Dep. p. 125). Shortly after his coworkers created the living area for him, Green discovered the arrangement and became upset with Franco. (Franco Dep. p. 125). After a period of time, Franco convinced Yellowstone to offer

3

Jenkins a lease to stay in the apartment at a reduced rate (Franco Dep. pp. 125, 147-48). Roman assisted Jenkins with fixing up the apartment. (Jenkins. Dep. p. 55). Jenkins' coworkers supported him in other ways throughout his employment. On one occasion, Jenkins got into a fight with his girlfriend's former boyfriend. Franco and some of his other coworkers came to his defense and got the boyfriend to leave. (Jenkins Dep. pp. 94-95; Franco Dep. pp. 106-07).

Like many apartment buildings in New York City, the building at 731 Gerard had rats. (Jenkins Dep. p. 130). It is undisputed that the building consistently had rats. The rat situation at 731 Gerard appears to have been exacerbated by construction that was being completed on the New York City Subway Four Train, which runs behind 731 Gerard. (Franco Dep. p. 35). Jenkins, like the other porters at 731 encountered the rats when he would clean the compactor. The rats were attracted to garbage. (Jenkins Dep. p. 132). The porter after Jenkins at 731 had to deal with the same issues. (Jenkins. Dep. pp. 134-35).

Jenkins alleges that he was transferred to 151 in retaliation for complaining about the rats at 731. (Jenkins Dep. p. 135). But at the time he was transferred to 151st Street in January 2016, there was no rat issue at the building. (Franco Dep. pp. 35-36). And Franco made the decision to transfer Jenkins to alleviate Jenkins' issue with the rats at 731 Gerard. (Franco Dep. p. 35). At that time, there was no issue with the rats at 151st Street. (Franco Dep. p. 35). But within a month and a half a rat problem developed at 151st Street and Jenkins complained to Franco about it. (Franco Dep. p. 37). There is no dispute that 151st Street eventually had a significant number of rats. (Roman Dep. pp 59-60, 63-64). As with 731 Gerard, the issue appeared to have been exacerbated by railroad construction in the area; in this case, Metro-North. (Roman Dep. pp. 60-63; Franco Dep. pp. 64-65). In Jenkins' view, the rat issue at 151st Street was worse than at 731 Gerard. (Jenkins Dep. pp. 137-38). After he had been working at 151st Street for some

time, Jenkins explained to Roman that he did not like to work on the compactors because of the rats. (Roman Dep. pp. 52-53). As a result, Roman would do Jenkins job for him; the rats did not bother Roman. (Jenkins Dep. p. 142; Roman Dep. pp. 53-54). Roman and Jenkins both complained about the rats to Franco. (Jenkins Dep. pp. 56-57, 132; Roman Dep. p. 54).

In August of 2015, about midway through his stint at 731 Gerard, Jenkins verbally complained to Franco about the rats at 731 Gerard (Franco Dep. p. 33, 34). Despite this, Roman regularly would help Jenkins with the compactor work and trash. (Roman Tr. 102).

Yellowstone recognized and made substantial efforts to mitigate the rat problem. rat mitigation efforts. They put out rat traps. (Jenkins Dep. p. 133; Roman Dep. p. 66; Franco Dep. pp. 67-69). They brought exterminators that put out poison and extra traps. (Jenkins Dep. p. 133; Roman Dep. p. 66; Franco Dep. pp. 59, 66); (Invoices, Morris Dec. Ex. E).

In July 2017, after learning from the exterminating company that the rat problem was under control, Yellowstone bought protective gear for Jenkins so he would feel more comfortable working in the compactor. (Franco Dep. pp. 60-61). The protective equipment included a body suit, heavy duty rubber boots, heavy duty rubber gloves, and a face protector mask. (Jenkins Dep. pp.153-54; July 19, 2017 Letter, Morris Dec. F). Jenkins indicated an appreciation for the protective gear. (Jenkins Dep. p. 155).

On July 25, 2017, Jenkins sent a text message alleging that Yellowstone had neglected a rat problem at 151st Street (Jenkins Text Message, Morris Dec. Ex. G). Yellowstone responded that day with a letter describing its efforts to mitigate the rat issue at 151st Street. (July 25, 2017 Letter, Morris Dec. Ex. H). It explained that it had a regular rat abatement process that included bait stations and extermination services as well as additional, focused efforts to provide abatement. The letter provided:

[Yellowstone] takes addressing extermination issues very seriously. Upon purchase of the building in April 2009, [Yellowstone] hired a company that manages the building bait stations, compactors, apartment and building -wide extermination services. In an effort to further address a problem caused by the train behind the building and the new construction across the street, [Yellowstone] hired a new company in September 2015. On a monthly basis they service building -wide extermination issues. In addition, we have hired them for three separate projects. I attach a September 10, 2015 invoice that explains, in full, their services rendered at the time they were hired. I have attached 2 invoices dated October 11, 2016 invoice where the company specifically cleaned out the compactor chutes (invoice 288791) and also agreed to ongoing chute maintenance (invoice 214458). And, I have enclosed an invoice dated 7/3/2017 where they repeated the full building -wide work (including work in the compactor room) completed September 10, 2015. We have them scheduled, again, for a compactor chute cleaning in October 2017.

(July 25, 2017 Letter, Morris Dec. Ex. H; Invoices Morris Dec. Ex. E).

In 2017, Jenkins fell behind on his rent. (Jenkins Dep. p. 57). Simultaneous with Yellowstone's efforts to collect the rent that Jenkins owed, his work performance deteriorated, and they began to have to write him up. On May 23, 2017, Franco instructed Jenkins and a coworker to respond to a tenant emergency. (Franco Dep. pp. 95-96). They failed to do so. (Franco Dep. p. 99). On May 23, 2017 Jenkins, along with his coworker, were written up for failing to respond to promptly respond to a tenant emergency. (May 23, 2017 Memorandum, Morris Dec. Ex. I; Roman Dep. p. 87; Franco Dep. p. 101). Jenkins signed the disciplinary notice.

On June 6, 2017, Jenkins, Franco, Green, and Roman all met in Roman's office to address Jenkins' work performance, come to an understanding of Yellowstone's expectations for his employment, and to make him a better worker. (June 7, 2017 Memorandum, Morris Dec. Ex. J); (Jenkins Dep. p. 167; Franco Dep. p. 104).  Roman tried to train Jenkins to make him better

qualified to receive extra jobs. (Roman Dep. pp. 29-30, 33). Franco thought that Jenkins, despite some shortcomings, had potential. (Franco Dep. p. 105).

On July 12, 2017, Jenkins sent a text message to a group of his coworkers alleging that Franco was receiving kickbacks and that as a result Jenkins and the other workers were losing lucrative "side work". (Jenkins Text Message, Morris Dec. Ex. K); (Jenkins Dep. pp. 171-72, 180). Jenkins had already been instructed that the side work that he was complaining about was going to stop as of January 2017. (Roman Dep. pp. 44-45). As a result, five days after the text message, Franco issued a written discipline for Jenkins' insubordinate and untruthful text message. (July 17, 2017 Memorandum, Morris Dec. Ex. L).

In a memorandum drafted July 25, 2017, Green intended to suspend Jenkins for four days for refusing to clean out the compactors. (Franco Dep. pp. 72, 131-32; July 25, 2017 Memorandum, Morris Dec. Ex. M). But a day later, Green instructed his staff that Jenkins would not need to perform compactor work and other employees would cover for him. (July 26, 2017 Email, Morris Dec. Ex. N). It was all rendered moot when Jenkins quit his employment on July 28, 2017. (Franco Dep. p. 72; Roman July 28, 2017, Memorandum, Morris Dec. Ex. O; Aug. 8, 2017 Letter, Morris Dec. Ex. P).

Jenkins told Roman he was quitting because he was frustrated with the pay and rats. (Roman Dep. pp. 27-29). Roman recalls Jenkins said that he quit and left his key with Roman and believes that Jenkins quit. (Roman Dep. pp. 81, 103, 107; Franco Dep. p. 16).  Roman had drafted and signed a memorandum that day, which states that Jenkins quit after Roman asked him to clean the building, including sweeping and mopping the landings and staircases. Jenkins refused and when Roman told him that if he continued to refuse to perform the assignment, he would be written up, Jenkins quit. (Roman July 28, 2017, Memorandum, Morris Dec. Ex. O).

Although Jenkins' coworkers assisted him with his housing situation, performed some of his work for him, came to his aid when he was about to get in a fight, and engaged in a collegial work environment, Jenkins now alleges that he was subjected to discrimination and a hostile work environment because of his race. He claims that he Jenkins, Roman, Franco, and two other coworkers participated in a group text. (Roman Dep. pp. 56). Jenkins claims that in a group text message with his coworkers and Franco the n-word was used everyday. (Jenkins Dep. pp. 110, 113, 114, 115). He also alleges the Franco called him a "black nigga" on three or four occasions. (Jenkins dep. pp. 120-21). Despite his allegations, a review of more than 1,000 pages of text messages between his coworkers produced a dozen instances during a two month stand where the word "nigga" was used by the workers, including Jenkins. (Jenkins dep. p. 118; Text Messages, Morris Dec. Ex. Q). And Jenkins did not produce a single text message to support his assertion. (Jenkins dep. p. 118). Jenkins also claims that his coworker Carlos Aracena discriminated against him when by calling him 'monkey butt' on one occasion. (Jenkins Dep. pp. 111, 113). Jenkins's discrimination claim is predicated on his allegation that Franco singled him out when he asked him to clean a base board. At some point in the Spring or Summer of 2017, Franco observed that the baseboards were dirty and asked Jenkins to clean them. (Franco Dep. pp. 83-84). Jenkins alleges that Franco discriminated against him because he was asked to clean the baseboards while others were not (Jenkins Dep. pp. 111, 121-22; Text Messages, Morris Dec. Exhibit R). At the time, Jenkins claimed that he was being singled out, but Franco explained that his coworkers cleaned the baseboards without being asked. (Text Messages, Morris Dec. Ex. R; Franco Dep. pp. 90-91). Roman helped him clean and paint the baseboards. (Roman Dep. p. 77). Jenkins was never disciplined for failing to clean the baseboards.

As set forth more fully below, Jenkins is unable to prove his State Law claims and they should be dismissed.

## Argument

### 1.   Summary Judgment Standard

If there are no genuine issues of material fact, a court can direct judgment in favor of a party. Fed. R. Civ. P. 56(c). To defeat a motion for summary judgment, the Plaintiff must provide "concrete particulars" showing that there is a genuine issue of fact. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984); *O'Sullivan v. New York Times*, 37 F. Supp. 2d 307, 314 (S.D.N.Y. 1999). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 50 (2d Cir. 2009). Mere conclusions or unsubstantiated allegations are insufficient for showing genuine issues of fact. *See Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985). Summary judgment is available in employment discrimination actions; employment cases are not treated differently than other cases. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000).

### 2.   Jenkins cannot make out a claim for discrimination under the State or City Human Rights Law because Yellowstone applied the same standards to him that it applied to his coworkers

Jenkins' discrimination claim is predicated on his belief that Franco singled him out when he asked him to clean some baseboards that Franco observed to be dirty. Because Franco expected all of the other porters to keep the baseboard's clean, Jenkins' allegations are not sufficient to make out a claim for discrimination under either the State or City Human Rights laws.

### A.   New York State Human Rights Law

Claims arising under the State Human Rights Law "are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993); *Richards v. New York City Dep't of Educ.*, No. 13-CV-16 VEC, 2015 WL 4164746, at *6 (S.D.N.Y. July 10, 2015) (citations omitted). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Richards*, 2015 WL 4164746, at *6 (*quoting Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014)). Plaintiff bears the burden of establishing a *prima facie* case of discrimination by showing that "(1) he belonged to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015).

"[P]laintiff bears the burden of proving not just pretext, but racial discrimination…and thus the burden of pointing the court to the existence of evidence that would raise a disputed issue of material fact on this score." *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 296 (S.D.N.Y. 2012). "Notably, in order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext for discrimination." *Id.*

Simply being assigned unfavorable schedules or work assignments fails to establish adverse employment action, since it does not have a material impact on the terms and conditions

of employment. *See Katz v. Beth Israel Med. Ctr.*, No. 95 CIV. 7183 AGS, 2001 WL 11064

(S.D.N.Y. Jan. 4, 2001) ("receiving unfavorable schedules or work assignments . . . do not rise to

the level of adverse employment action"); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352

(S.D.N.Y. 2006) ("change in job responsibilities . . . not adverse employment action unless

accompanied by materially adverse changes in employment such as demotion or loss of wages").

A materially adverse change "must be more disruptive than a mere inconvenience or an alteration

of job responsibilities" and "might be indicated by a termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices . . . unique to a particular

situation." *Fullard v. City of New York*, 274 F. Supp. 2d 347, 355 (S.D.N.Y. 2003) (quoting

*Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "The receipt of

undesirable assignments, without more, amounts to nothing more than a mere inconvenience, not

a materially adverse change in the terms and conditions of employment." *Henry v. NYC Health &*

*Hosp. Corp.*, 18 F. Supp. 3d 396 (S.D.N.Y. 2014); *Albuja v. Nat'l Broad. Co. Universal*, 851 F.

Supp. 2d 599, 607 (S.D.N.Y. 2012); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 370

(S.D.N.Y. 2005); *Furfero v. St. John's Univ.*, 94 A.D.3d 695, 698 (N.Y. App. Div. 2012)("there is

no merit to the plaintiffs' contention that they were subjected to an adverse employment action

due to the assignment of unfavorable course schedules"); *Chin v. New York City Hous. Auth.*, 106

A.D.3d 443 (N.Y. App. Div. 2013) (Assignment of undesirable clerical tasks did not constitute an

adverse employment action under the New York State Human Rights Law). Here, Jenkins is

unable to make out a claim for discrimination because the complained of conduct, a job

assignment, does not constitute and adverse employment action.

### B.   New York City Human Rights Law

The City Human Rights law takes a slightly broader view of what constitutes discrimination. "Although the text of the NYCHRL mirrors the NYSHRL…" by enacting the Local Civil Rights Restoration Act of 2005, "the New York City Council broadened the protection of the NYCHRL." *Richards*, 2015 WL 4164746, at *10. "NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims…" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).

In order to make out a *prima facie* claim for discrimination under the City Human Rights Law, a plaintiff needs to demonstrate, by a preponderance of the evidence, that he has been treated less well than other employees because of his status in a protected class. *See Mihalik*, 715 F.3d at 110 (*quoting Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 78 (N.Y. App. Div. 2009)). The City Human Rights Law retains the *McDonnell Douglas* burden-shifting analysis; "treated less well" is simply substituted for "adverse employment action." *See Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 340 (S.D.N.Y. 2010).

In this case, Jenkins' claim fails because he is unable to demonstrate that he was treated less well than his coworkers. He was treated the same. While Franco expected Jenkins to keep his building's base boards clean, he had the same expectations for Jenkins' coworkers. Franco only addressed the baseboards with Jenkins because he did not keep them clean. Jenkins is unable to show that the other buildings had dirty baseboards and Franco did not address them with him. He is unable to do so.

Even if he could show that he was treated differently, Jenkins also has to show that the complained of conduct was caused by a discriminatory motive. *Id.* An employer is still able to provide a legitimate business reason for the challenged decision, which the plaintiff must rebut with evidence that would permit a rational finder of fact to infer that the reason is a pretext for

discrimination. *See Vinokur v. Sovereign Bank*, 701 F. Supp. 2d 276, 287 (E.D.N.Y. 2010). In this case, there is no evidence of discriminatory animus. Franco hired Jenkins. He provided him with living arrangements, despite knowing that Green would be upset with him. He advocated for lower rent for Jenkins. He defended him when he got in a fight. There is no animus. Franco was just trying to do his job — make sure the building was clean — when he asked Jenkins to clean the base boards.

3.   Jenkins cannot make out a claim for a Hostile Work Environment under either the State or City Human Rights Law because the alleged comments were not sufficiently severe

Jenkins' Hostile Work Environment claims are based on allegations that are not supported by the record. Jenkins claims that, in a group text message with his coworkers, the n-word was used everyday. (Jenkins Dep. pp. 110, 113, 114, 115). He also alleges the Franco called him a "black nigga" on three or four occasions over the course of his employment. (Jenkins dep. pp. 120-21). Jenkins also claims that his coworker Carlos Aracena discriminated against him when he called him monkey butt in one of the group chats. (Jenkins Dep. pp. 111, 113). Despite his allegations, a review of more than 1,000 pages of text messages between his coworkers produced a dozen instances where the word "nigga" was used, including by Jenkins himself. (Jenkins dep. p. 118; Morris Dec. Ex. Q). And Jenkins did not produce a single text message to support his assertion. (Jenkins Dep. p. 118). Even if his allegations were true, there is not sufficient evidence to constitute a Hostile Work Environment under either the State or City Human Rights law.

A.   New York State Human Rights Law

"To prove a hostile work environment claim under [the State Human Rights Law], a plaintiff must show that [his] 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Richards*, 2015 WL 4164746, at *10

(citations omitted). "This standard has both objective and subjective components: the conduct

complained of must be severe or pervasive enough that a reasonable person would find it hostile

or abusive, and the victim must subjectively perceive the work environment to be abusive."

*Richards*, 2015 WL 4164746, at *10 (*quoting Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir.

2014)). "It is axiomatic that the plaintiff also must show that the hostile conduct occurred

because of a protected characteristic." *Tolbert*, 790 F.3d at 439.

   Various factors, such as frequency and severity of the discrimination, whether the allegedly

discriminatory actions were threatening or humiliating or a "mere offensive utterance," and

whether the alleged actions "unreasonably interfere with an employee's work" are to be

considered in determining whether a hostile work environment exists. *La Marca-Pagano v. Dr.*

*Steven Phillips, P.C.*, 129 A.D.3d 918 (N.Y. App. Div. 2015) (citing *Forrest v. Jewish Guild for*

*the Blind*, 3 N.Y.3d 295, 310–311 (2004) and *Chiara v. Town of New Castle*, 126 A.D.3d 111

(N.Y. App. Div. 2015)). The allegedly abusive conduct must not only have altered the conditions

of employment of the employee, who subjectively viewed the actions as abusive, but the actions

must have created an "objectively hostile or abusive environment—one that a reasonable person

would find to be so" *Id.*

   It has been repeatedly held that "ordinary tribulations of the workplace, such as the sporadic

use of abusive language, gender-related jokes, and occasional teasing" are not objectively severe

enough to establish a hostile work environment. *Serrano v. New York State Dep't of Envtl.*

*Conservation*, No. 12-CV-1592 (MAD/CFH), 2017 WL 1194238, at *3–4 (N.D.N.Y. Mar. 30,

2017), *aff'd,* 714 F. App'x 90 (2d Cir. 2018)(unpublished) (citing *Faragher v. City of Boca Raton*,

524 U.S. 775, 778 (1998)). The test not only looks at isolated incidents, but requires

14

consideration of all the circumstances present in the workplace contributing to its environment, such as the amount that the alleged conduct interferes with an employee's work performance, its frequency, severity, and threatening nature. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

"For 'racist comments, slurs, and jokes' to be actionable as a hostile work environment, there generally 'must be more than a few isolated incidents of racial enmity.' " *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 673 (S.D.N.Y. 2012) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). Rather, "'there must be a steady barrage of opprobrious racist comments.' " *Id.* (quoting *Schwapp*, 118 F.3d at 110). See also *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07 CIV. 11316 (HB), 2009 WL 900739, at *8 (S.D.N.Y. Apr. 3, 2009) (finding the use of the expression "black ass" to refer to the plaintiff on three occasions, even when considered in conjunction with other offensive conduct such as ignoring and monitoring the plaintiff's whereabouts, was insufficient to support a hostile work environment claim); *Pagan v. New York State Div. of Parole*, No. 98 CIV.5840 FM, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (multiple derogatory remarks concerning Puerto Ricans or Hispanics did not establish a hostile work environment) (collecting cases). "The mere utterance of an epithet which engenders offensive feelings in an employee" does not rise to the level of implicating Title VII." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 279 (S.D.N.Y. 2007) (no finding of hostile work environment despite certain employees of defendant repeatedly referring to group including heterosexual male plaintiff in terms used to describe women) (alterations and citations omitted). Even comments that are wholly inappropriate, if not cruel, are not necessarily severe enough to sustain a hostile work environment claim. *Lytle v. JPMorgan Chase*, No. 08 CIV. 9503 DAB JLC, 2012 WL 393008, at *26 (S.D.N.Y. Feb. 8, 2012), *report and recommendation*

*adopted sub nom. Lytle v. JP Morgan Chase*, No. 08 CIV. 9503 DAB, 2012 WL 1079964
(S.D.N.Y. Mar. 30, 2012), *aff'd*, 518 F. App'x 49 (2d Cir. 2013) (unpublished) (citing *Adam v.
Glen Cove Sch.*, No. 06-CV-1200 JFB MLO, 2008 WL 508689, at *11 (E.D.N.Y. Feb. 21, 2008)
(two alleged uses of "N word" insufficient to sustain claim for hostile work environment); and
*Pagan*, 2003 WL 22723013. The usage is notably less aggressive than in *Lumhoo v. Home Depot
USA, Inc.*, 229 F. Supp. 2d 121, 153 (E.D.N.Y. 2002), where the plaintiff were called "worthless
niggers," and being told, "you don't matter ... what he says goes ... You jump when he says
jump," fostered an abusive working environment.

 Here, the comments are limited in number and within a relatively small-time frame and
limited. Whether appropriate or not, they do not constitute an actionable hostile work
environment under the State Human Rights law.

### B.   New York City Human Rights Law

 The City Human Rights Law treats hostile work environment claims almost identically to
discrimination claims. *Rogers v. Bank of New York Mellon*, No. 09 CIV. 8551 (HBP), 2016 WL
4362204, at *13 (S.D.N.Y. Aug. 15, 2016), *on reconsideration,* No. 09 CIV. 8551 (HBP), 2017
WL 4157376 (S.D.N.Y. Sept. 19, 2017); *see also Tse v. New York Univ.*, No. 10 CIV. 7207 DAB,
2013 WL 5288848, at *16 (S.D.N.Y. Sept. 19, 2013). "The NYCHRL permits hostile work
environment claims based on a lesser showing than is required by Title VII and the NYSHRL."
*Richards*, 2015 WL 4164746, at *12. Hostile work environment claims under the City Human
Rights Law are not evaluated under the State Human Rights Law's "severe or pervasive"
standard for hostile work environment claims. *Kaur*, 688 F. Supp. 2d at 340 (*citing Kolenovic v.
ABM Indus. Inc.*, 361 F. App'x 246 (2d Cir. 2010)). "Under the [NY]CHRL's more liberal
standard, a plaintiff must 'show that her employer treated her less well than other similarly

situated employees, at least in part for discriminatory reasons.'" *Richards*, 2015 WL 4164746, at *12 (citations omitted).

While the standard for a hostile work environment claim under the City Human Rights Law is more liberal than the State Human Rights Law, the City Human Rights Law does not operate as a general civility code. This is a lower standard than the Title VII and State Human Rights Law standard, but it is not "a general civility code." *Kaur*, 688 F. Supp. 2d at 340. Therefore, "summary judgment [is] still…available where [the defendant] can prove that the alleged discriminatory conduct in question…could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences." *Id.* (citing *Williams*, 61 A.D.3d 62; *Buchwald v. Silverman Shin & Byrne PLLC*, 149 A.D.3d 560 (N.Y. App. Div. 2017).

Jenkins' hostile work environment claims fail under the City Human Rights Law where the record shows, as it does here, that "the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Williams*, 61 A.D.3d at 79–80. Even affording Jenkins every favorable inference as a non-moving party, the conduct complained of consists of a few remarks in a concentrate period and some alleged comments spread out over nearly three years of employment that were not accompanied by threatening physical conduct. Analyzing all conduct under the "totality of circumstances," Jenkins' allegations are insufficient as a matter of law under the City Human Rights Law and are, at best, "petty slights and trivial inconveniences" insufficient as a matter of law to state a claim. *Cf. Kaur*, 688 F. Supp. 2d at 327–23 (a plaintiff's complaints that she was told by a supervisor "[y]ou eat shit and holy cow" and that Indians "sell [their] daughters," that she was dangerous and belonged to the Taliban, and that her food was thrown out on three occasions, all categorized as petty slights and trivial inconveniences);

*Panzarino v. Deloitte & Touche LLP*, No. 05 CIV.8502 BSJ RLE, 2009 WL 3539685, at *10 (S.D.N.Y. Oct. 29, 2009) (plaintiff experienced petty slights and trivial inconveniences when company principal stated a hiring preference for males because too many females were going on maternity leave, that everyone was getting "knocked up," and had repeatedly used derogatory, sexual language); *Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP*, 120 A.D.3d 18, 26 (N.Y. App. Div. 2014) a hostile work environment claim where the plaintiff "cites only isolated remarks or incidents" that "a reasonable person would consider [...] nothing more than petty slights").

Isolated comments, such as the comments Jenkins' alleges, are insufficient as a matter of law to give rise to a hostile work environment, and his claim must be dismissed.

### 4. Jenkins' Whistleblower claim fails because he is unable to identify an actual violation of the law that presented a general threat to the public safety

An employer shall not take any retaliatory personnel action against an employee because such employee, among other things, either (1) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety or (2) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation. N.Y. Lab. Law § 740 (McKinney). To establish a claim under N.Y. Lab. Law § 740, a plaintiff must establish: (1) "'a violation of a law, rule or regulation, which violation must be actual and not merely possible,' and (2) demonstrate that 'the lack of compliance presents a substantial and specific danger to the public health or safety.'" *Frank v. Walgreens Co.*, No. 09 CV 955 DRH WDW, 2011 WL 4465210, at *4 (E.D.N.Y. Sept. 26, 2011)(*citing Perez v. Consol. Edison Corp. of New York*, No. 02CIV.2832(PKC)(FM), 2006

WL 2707316, at *16 (S.D.N.Y. Sept. 20, 2006)); *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 23 N.Y.3d 448 (2014).

While a plaintiff need not plead a violation of the law in his or her complaint, in order to **recover** under § 740, a plaintiff must prove "that an actual violation occurred, as opposed to merely establishing that [he] possessed a reasonable belief that a violation occurred." *Webb-Weber*, 23 N.Y.3d at 452; *see also Tomo v. Episcopal Health Servs., Inc.*, 85 A.D.3d 766 (N.Y. App. Div. 2011). "The employee must prove that his complaints or refusals to participate were in response to 'an actual violation of a relevant law, rule or regulation." *Noble v. 93 Univ. Place Corp.*, 303 F. Supp. 2d 365, 373 (S.D.N.Y. 2003)(quoting *Dougherty v. Mem'l Sloan-Kettering Cancer Ctr.*, No. 00 CIV.4083 JGK, 2002 WL 1610916, at *4 (S.D.N.Y. July 22, 2002)). "Law, rule or regulation" includes any duly enacted statute or ordinance or any rule or regulation promulgated pursuant to any federal, state or local statute or ordinance. N.Y. Lab. Law § 740

In addition, "[t]he threat to public safety has generally been narrowly construed to apply to the public at large." *Reyes v. Energy Transp. Corp.*, No. 96 CIV. 3321 (JSM), 1997 WL 256923, at *4 (S.D.N.Y. May 16, 1997). In *Frank v. Walgreens Co.*, the court determined that danger posed to a single child did not constitute a danger to the public health or safety. *Frank*, 2011 WL 4465210, at *5.

There is no dispute that Jenkins complained about rats to Franco. But the complaints alone are not enough to make out a whistleblower claim. Jenkins' complaints about the rats or the compactor do not provide him with the protections of N.Y. Lab. Law § 740 because he cannot prove a violation of the law. It is not enough that he thought the rat problem or the compactor to be unsafe or unsanitary. He must prove an allegation of the law. His complaint is devoid of any allegation that Yellowstone violated the law. As such, his claim fails. Further, both the rat and

compactor issue were specific to Jenkins, there is no evidence of a threat to the public at large. As such, Jenkins has not established that he is entitled to the law's protections.

Even if Jenkins could establish that he was protected by N.Y. Lab. Law § 740, his Whistleblower claims fail because there is no evidence that Yellowstone retaliated against him. First, Jenkins voluntarily left his employment, which means that he is unable to recover under the whistleblower statute. *See McNally v. Swift Transp. Co.*, 35 A.D.3d 1238 (N.Y. App. Div. 2006). But even if he was fired, there is no evidence of retaliation. Yellowstone was aware of the rat issue and took steps to ameliorate it. They transferred him in the hope that the rats would be less prevalent at 151st Street than at 731 Gerard, even if that turned out to only initially be the case. Yellowstone also provided him with protective equipment, that was not provided for any other employee. Regularly, Roman, Jenkins' supervisor, stepped in to perform the garbage work for him. Even more significantly, Roman complained about the rats as well. If Yellowstone harbored animus about the complaints, Roman would have been treated the same as Jenkins. In short, there is nothing to suggest that Yellowstone harbored any animus against Jenkins because of his complaints about the rats.

To the extent Jenkins brings his Whistleblower claim against Franco, the Court should dismiss the cause of action against Franco because he is not an "employer" within the meaning of N.Y. Lab. Law § 740. *Ruiz v. Lenox Hill Hosp.*, 146 A.D.3d 605 (N.Y. App. Div. 2017) (citing *Ulysse v. AAR Aircraft Component Servs.*, 128 A.D.3d 1053, 1054 (N.Y. App. Div. 2015); *Geldzahler v. New York Med. Coll.*, 746 F. Supp. 2d 618, 632 (S.D.N.Y. 2010).

5. **Jenkins' Intentional Infliction of Emotional Distress cause of action fails because he cannot meet the high evidentiary threshold imposed by New York Courts**

Jenkins' Intentional Infliction of Emotional Distress cause of action is predicated on his allegation that he was forced to work in an area where he was exposed to rats. But his allegations

fall short of the high standard imposed by New York Courts for Intentional Infliction of Emotional Distress claims.

New York Courts have made clear that the threshold for bringing an intentional infliction of emotional distress claim is extraordinarily high. Claims for intentional infliction of emotional distress have four elements:

- extreme and outrageous conduct;
- intent to cause severe emotional distress;
- a causal connection between the conduct and the injury; and,
- severe emotional distress.

*See Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (*citing Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)).

To meet New York's high threshold for "extreme and outrageous" conduct, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized [society]." *See Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293, 303 (1983).

> Courts in the Second Circuit, when considering emotional distress claims under New York law, have noted that even if a 'defendant has acted with an intent which is tortious or even criminal,' or 'has intended to inflict emotional distress,' or has even engaged in conduct that 'has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort,' there can be no claim if the conduct at issue is not 'utterly reprehensible."

*Freedom Calls Found. v. Bukstel*, No. 05 CV 5460 SJ VVP, 2006 WL 2792762, at *3 (E.D.N.Y. Sept. 7, 2006) (citing *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)).

This high standard was explained in *Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46 (2016). In *Chanko*, the plaintiffs alleged, *inter alia*, intentional infliction of emotional distress where the defendant broadcasted and disseminated video footage of the plaintiffs' family member in his final moments of life, including hearing decedent speaking and moaning,

21

watching him die, seeing the doctor declare decedent dead, and then watching the doctor advise plaintiffs that decedent died. *Id.* at 51. While reprehensible, the New York Court of Appeals affirmed the dismissal of plaintiffs' claim because defendant's conduct "did not rise to the level required to establish 'extreme and outrageous conduct' sufficient to state a cause of action for intentional infliction of emotional distress." *Id.* at 58 (collecting cases where conduct was not sufficiently "extreme and outrageous").

In *Robles v. Cox & Co.*, 841 F. Supp. 2d 615 (E.D.N.Y. 2012), the plaintiff's intentional infliction of emotional distress claim was based on allegations that her employer exposed her to years of sexual harassment, falsely terminated her employment, then reinstated her to a position that exposed her to harmful toxins that the employer knew caused her a previous injury, and then terminated her employment a second time for discriminatory reasons. *Id.* at 630–631. The *Robles* court concluded that these allegations were not "extreme and outrageous" enough to state a plausible claim for intentional infliction of emotional distress, and the court dismissed the claim on a Fed. R. Civ. P. 12(b)(6) motion. *Id.* at 632.

 "Courts in the Second Circuit, when considering emotional distress claims under New York law, have noted that even if a 'defendant has acted with an intent which is tortious or even criminal,' or 'has intended to inflict emotional distress,' or has even engaged in conduct that 'has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort,' there can be no claim if the conduct at issue is not 'utterly reprehensible.'" *Freedom Calls Foundation*, 2006 WL 2792762, at *3 (*citing Stuto*, 164 F.3d at 827).

Against this backdrop, Jenkins's allegations do not rise the level of "extreme and outrageous" conduct required to state an intentional infliction of emotional distress claim. Here,

Jenkins alleges that Defendants ordered him to take out the garbage and clean compactors with the intent to cause him severe emotional distress. But Jenkins was simply assigned to perform the same task that all the porters were required to do – taking out the garbage. He was exposed to rats the same way that the other porters before him, and after him, were exposed. Conduct cannot be extreme and outrageous where other employees perform the same task without complaint. It is notable in this regard that Roman regularly performed the work that forms the basis of Jenkins' complaint for him, and without issue. Yellowstone's significant efforts to mitigate the rat problem further undercuts Jenkins claim of intent. Simply put, Jenkins's allegations do not rise to the level of "extreme and outrageous" conduct necessary to plead a claim for intentional infliction of emotional distress. Further, there is no evidence that Jenkins suffered severe emotional distress, he claims he had bad dreams and general anxiety, but was never treated for or diagnosed with any emotional condition. (Jenkins Dep. pp.155-156).

The alleged conduct here is significantly less "extreme and outrageous" than other alleged conduct that Courts in this Circuit and State have determined did not meet the high threshold for intentional infliction of emotional distress. Jenkins's claims here, based on exposure to rats, are far less "extreme and outrageous" than the allegations dismissed by the *Robles* court. If asking a building service worker to take out, or clean up, garbage in a building where rats are present constitutes an extreme or outrageous conduct sufficient to establish a claim, every building service worker in New York City potentially has a claim, which would be completely inconsistent with the standard set forth by the Courts. Because Jenkins fails to allege that Defendants engaged in conduct that meets the high threshold for "extreme and outrageous" conduct, and there is no subjective or objective evidence of emotional distress, the Court should dismiss his intentional infliction of emotional distress cause of action.

6.   Jenkins' spread-of-hours cause of action must be dismissed because New York Labor Law's spread-of-hours requirement does not apply to Building Service Workers.

Jenkins' spread-of-hours claim fails because he was a building service worker and the spread-of-hours requirement does not apply to building service worker. The New York Commissioner of Labor publishes minimum wage orders that function as wage-and-hour regulations for workers in a variety of different industries, including building service, hospitality, and "miscellaneous industries and occupations". See, e.g., 12 NYCRR § 141 (building service industry); § 146 (hospitality industry); and, § 142 (miscellaneous industries and occupations). The wage order for Miscellaneous Industries and Occupations provides that employees must be paid a premium "in addition to the minimum wage" for every day that the "spread" between their start and stop time "exceeds 10 hours." *Id*. § 142-2.4(a). Jenkins' Complaint alleges that Defendants violated this provision of the law. (Complaint Count 3). But Jenkins' claim fails because the Miscellaneous Industries Order "does not apply to 'employees covered by ... any other minimum wage order'" and the order that does apply, the Building Service Wage Order does not contain a similar provision. *cf*. 12 NYCRR 142 and 12 NYCRR § 141.

The Building Service Order protects the employees of "any person, corporation or establishment engaged in whole or in part in renting, servicing, cleaning, maintaining, selling, or managing buildings or building space." 12 NYCRR § 141-3.1.3. There can be no dispute that the Building Service Wage Order applies and Yellowstone was not required to pay any spread-of-hours premium to employees as a result. *Almonte v. 437 Morris Park, LLC*, No. 14 CIV. 5951 (KPF), 2015 WL 7460019, at *3 (S.D.N.Y. Nov. 24, 2015).

24

7. **There is no independent cause of action for a recordkeeping violation under the FLSA, so Jenkins' Fourth Cause of Action should be dismissed**

FLSA § 215 makes it "unlawful" to violate the record keeping provision set forth in FLSA § 211(c). Fair Labors Standards Act, 29 U.S.C.A. § 211(c) (West); 29 U.S.C.A. § 215 (West). But courts have repeatedly found that the FLSA does not authorize employees to bring a private action against an employer for failure to abide by the record-keeping requirements of Section 211(c). Rather, that authority is vested exclusively with the Secretary of Labor. *Ayala v. Looks Great Services, Inc.*, 14-CV-6035 ADS SIL, 2015 WL 4509133, at *6 (E.D.N.Y. July 23, 2015) (citing *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 843 (6th Cir. 2002). *Mariano v. Town of Orchard Park*, No. 09-CV-916S, 2011 WL 5979261, at *3 (W.D.N.Y. Nov. 27, 2011). *Cunningham v. Elec. Data Sys. Corp.*, 579 F. Supp. 2d 538, 543 (S.D.N.Y. 2008)). As such, to the extent Jenkins' Complaint purports to assert a claim under the FLSA's record-keeping provisions, the Court should dismiss that cause of action.

## Conclusion

For the reasons set forth herein, Defendants respectfully request that this Court dismiss the Complaint as to the third through eleventh Cause of Action and grant Defendants such other and further relief as the Court deems just and proper.

Dated:  December 7, 2018
         New York, New York

                    CLIFTON BUDD & DEMARIA, LLP
                    *Attorneys for Defendants*

                    By:_____/ s /_____
                       Daniel W. Morris (DM 5934)
                       350 Fifth Avenue, Suite 6110
                       New York, New York 10118
                       Tel: (212) 687-7410
                          dwmorris@cbdm.com